In re Jerry Henry GRANT, Debtor.

Jerry Henry Grant, Plaintiff,

v.

State of Oklahoma ex rel. Physician Manpower Training Commission; Sallie Mae Servicing, L.P.; and Eastern Oklahoma Health Care Corporation, Defendants.

Bankruptcy No. 1:02–BK–70071.
Adversary No. 1–02–ap–7047.

United States Bankruptcy Court,
W.D. Arkansas,
El Dorado Division.

Feb. 18, 2004.

Teresa M. Wineland, Shackleford Law Firm, El Dorado, AR, for Debtor.

## MEMORANDUM OPINION

JAMES G. MIXON, Bankruptcy Judge.

Jerry Henry Grant ("Debtor") filed this complaint to determine the dischargeability of various student loan debts and other types of payments he received to finance his education and training as a physician. The Debtor states in his complaint that excepting these debts from discharge will impose an undue hardship on the Debtor and Gianna Grant, the Debtor's wife.

Prior to a hearing upon the complaint, the Court granted a motion to dismiss filed by the State of Oklahoma on behalf of Physician Manpower Training Commission ("Manpower") and Sallie Mae Servicing L.P. ("Sallie Mae"). The Court found that the Eleventh Amendment prevented suit in federal court against the State of Oklahoma brought by a citizen of another state. The Debtor's debt to this entity ("Manpower debt") is approximately $80,000.00.

The Court also granted a motion to dismiss filed by the United States Department of Health and Human Services as substituted party for Sallie Mae with regard to Health Education Assistance Loans ("HEAL debt") in the approximate sum of $8,000.00.

Trial on the complaint against the remaining defendants was set for October 23, 2003, in El Dorado, Arkansas. On the day of trial, Defendant Eastern Oklahoma Health Care Corporation ("EOHCC") failed to appear, and the Debtor was awarded a default judgment allowing a discharge of approximately $120,000.00 ("EOHCC debt"). The Debtor proceeded to trial against the only remaining defendant, Oklahoma State Regents for Higher Education ("Regents"), the party substituted for Sallie Mae, with regard to a student loan debt of approximately $42,000.00 ("Regents debt").

At the conclusion of the hearing on October 23, the Court left the record open so that the Debtor's tax returns could be completed and submitted as evidence of the Debtor's financial condition. After the final hearing on December 11, 2003, during which further testimony was adduced, the Court took under advisement the issue of whether requiring the Debtor to pay the $42,000.00 Regents debt will impose an undue hardship.

The Court has jurisdiction under 28 U.S.C. § 1334 and § 157. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I) (2000), and the Court may enter a final judgment in the case. The following shall constitute findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

## FACTS

The Debtor, a 38-year-old physician, practices family medicine in El Dorado. He received his medical degree from the University of Oklahoma in 1993. On January 4, 2002, he filed a chapter 7 petition under the provisions of the Bankruptcy Code. The bankruptcy was precipitated by the fact that Manpower took action to collect on a judgment it was awarded on September 8, 2000, against the Debtor for $81,469.94 and interest to accrue at the rate of 12%. The Debtor made partial payments on the judgment debt until shortly before he filed for bankruptcy.

The judgment in Manpower's favor resulted when the Debtor breached an agreement with Manpower to serve for three and one-half years in a rural Oklahoma community following completion of his residency. Manpower provided the

Debtor with scholarships during medical school in exchange for his agreement to practice medicine in the rural community. The Debtor breached the agreement because, although he passed all the required licensing tests, he failed to obtain a license to practice in Oklahoma despite repeated applications over a two-year period. The record is unclear as to the precise reason the Debtor was thwarted in his attempts to obtain a license,[1] but as a result, he was unable to fulfill his obligation to Manpower and was required to repay the scholarship funds with interest.

In 1997, the Debtor obtained a license to practice in Arkansas. After he completed his residency in 1998, he opened a walk-in clinic in a "very poor" residential neighborhood in El Dorado. (Tr. Oct. 23, 2003, at 61.) He currently operates the clinic with his wife, who is 28 years old and a registered nurse. The Debtor and his wife have no children.

The walk-in clinic is located in a small addition adjacent to his residence, which is a 1971 double-wide mobile home situated on property the Debtor is purchasing under a contract for sale for $40,000.00. The Debtor pays $512.76 a month for the property and will complete the contract in July 2005.

The Debtor paid for the 30 by 30 foot clinic addition by cashing an annuity that he had acquired as an intern by saving $500.00 a month. Three years after the clinic was built, the Debtor added a reception area and financed the later addition with a bank loan being paid back or already repaid by the Debtor's business.

According to the Debtor, the total value of the real property and improvements is $75,000.00 to $80,000.00. He stated that he operates his clinic as a professional corporation and that the business pays 40 percent of his monthly indebtedness on the property and a portion of the monthly utility costs billed to the property.

Other property owned by the Debtor includes a 1999 Honda SUV with 105,000 miles on the odometer. Post petition, he purchased a 1999 Ford F–150 truck for $14,500.00 financed by a three-year-note requiring payments of $407.36 a month. Also post petition, the Debtor purchased a $7000.00 motorcycle by making a $2,000.00 down payment and financing the remainder at 8.15% interest. He pays $357.00 a month on the motorcycle loan. He testified that there is no equity in the Ford truck and the motorcycle and that he gave to his father the motorcycle he listed on his schedules when he filed bankruptcy

The Debtor owns a $5000.00 IRA and savings bonds worth $4000.00 or $5000.00. He makes payments on a $100,000 whole life insurance policy, which has a cash value of $5,000.00 or $6,000.00.

His most valuable asset is his medical practice, which he operates as a professional corporation. The corporation pays the Debtor and his wife a small monthly salary and also makes distributions to the couple from the net income of the corporation. These distributions are taxed to the Debtor as dividends.

The Debtor operates his clinic from 10:00 a.m. to 6:00 p.m. Monday through Friday, except on Wednesday when he only works in the afternoon. He sees an average of 15 to 20 patients a day and charges $40.00 for office visits. His policy

---

1. Upon questioning by the Court as to why he was unable to obtain an Oklahoma license, the Debtor stated, "They [Oklahoma Board of Licensure] said if I would get my records from one of the rotations, if I would do this, do that—there was a whole list of things that were just impossible for me to do. So I wrote them a letter withdrawing my request for licensure, after two years of trying to get a license." (Tr. Oct. 23, 2003, at 63.)

is to file insurance claims only for Medicare and Medicaid patients, and he will not bill private health care insurance companies on behalf of his patients, although they may file their own claims. When asked at trial why he does not increase his standard charge, he replied, "I just don't want to." (Tr. Oct. 23, 2003, at 61.)

He has courtesy privileges at the local hospital so that he can order laboratory tests and x-rays for his patients, but he has not sought admitting privileges because he would have to serve on hospital call with the possibility of overnight duty. The Debtor testified that he is reluctant to take on the rigors of hospital call or establish a more vigorous practice because he has both high blood pressure and Type–II insulin-dependent diabetes, a condition that was diagnosed ten years ago when he was still in medical school.

Admitting that he "could work more," the Debtor chooses not to do so because he believes it would be detrimental to his health. (Tr. Oct. 23, 2003, at 55, 62.) Because of his pre-existing physical conditions, he has been denied both health and disability insurance coverage. Furthermore, if he allows his existing life insurance policy to lapse, he will be unable to acquire another policy at a later time.

Drafts of the Debtor's corporate and individual federal income tax returns reveal that in 2001 the Debtor and his wife received $82,642.00 in wages and distributions from the professional corporation, which grossed $143,508.00. They netted $62,925.00. In 2002, the Debtor and his wife received $89,206.00 in salary and distributions and netted $67,423.00. The corporation grossed $146,187.00 and retained $29,195.00 to carry over into 2003.

The Debtor stated that income from his practice has increased every year since

1999 and he expects it to continue to increase. The Debtor testified that in 2003, he and his wife paid $2,200.00 a month in federal and state income tax.

At trial, the Debtor offered an exhibit listing his current monthly expenses. These included the following:

| | |
|---|---|
| Utilities | $450 |
| Food | 500 |
| Clothing | 100 |
| Transportation | 200 |
| Home Insurance | 100 |
| Life Insurance | 280 |
| Car Insurance | 200 |
| Property taxes | 35 |
| Car note | 407 |
| Motorcycle note | 357 |
| House payment | 513 |
| Insulin | 150 |

(Pl.'s ex. 7, Oct. 23, 2003.)

The total of these expenses is $3,292.00. However, the Debtor's corporation pays $205.20 (40%) of the house payment, yielding a true total of $3,086.80 for monthly living expenses.

Other monthly liabilities that the Debtor must meet include a payment on the Manpower debt that is nondischargeable and currently totals approximately $80,000.00 payable at 12% interest per annum. The Debtor testified that if he pays this loan at the rate of $500 a month as in the past, he will never be able to repay the loan. Also nondischargeable is the HEAL debt equaling approximately $8,000.000 payable at an annual interest rate of 4.875%. Evidence offered by the Debtor reflects that paying $100.00 a month will defray the total obligation in eight years.

According to the evidence admitted at trial, the balance owed on the Regents debt is $42,331.65, payable at 9% interest. The Debtor's evidence reflects that it will take 33 years to pay the debt in full at the present rate of $335.00 a month.[2]

---

**2.** By the Court's calculation, the Regents debt would be paid in full in 31 years at $335.00 a

On the subject of his student loans, the Debtor testified that he began paying them back "From day one. I fell behind a couple of times but I always caught back up. For the last six months [before bankruptcy], I was paying Sallie Mae [on the Regents and HEAL debts] my regular payment plus $100 usually." (Tr. Oct. 23, 2003, at 28.)

The Debtor's wife holds a four-year nursing degree and will complete requirements for the Master's degree in nursing by the end of 2004. Her schooling will require $1,800.00 to $2,400.00 a semester for tuition and books. Additionally, the Debtor will have to hire a licensed practical nurse to substitute for his wife when she cannot work in the clinic because of course requirements. The Debtor's wife plans to continue to work in the clinic even after she completes her degree, although presumably with a master's degree in nursing she could earn more income working elsewhere. The Debtor and his wife view her work at the clinic as offering a more flexible schedule should they have children in the foreseeable future.

## CONCLUSIONS OF LAW

The Bankruptcy Code provides that:

A discharge under section 727 ... does not discharge an individual debtor from any debt—

(8) for an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or non-profit institution, or for an obligation to repay funds received as an educational benefit, scholarship, or stipend, unless excepting such debt from discharge ...

will impose an undue hardship on the debtor and the debtor's dependents....

11 U.S.C. § 523(a)(8) (2000).

■ This provision of the Bankruptcy Code clearly states that educational loan debts guaranteed by a governmental unit may only be discharged if paying such debts would impose an undue hardship on the debtor and his dependents. *Morgan v. U.S. Dept. of Higher Educ. (In re Morgan)*, 247 B.R. 776, 780 (Bankr.E.D.Ark. 2000). The debtor seeking discharge of an educational loan debt has the burden of proving that repayment of the debt will impose an undue hardship. *Maschka v. Nebraska Higher Educ. Loan Programs (In re Maschka)*, 89 B.R. 816, 818 (Bankr.D.Neb.1988)(citing *In re Binder*, 54 B.R. 736 (Bankr.D.N.D.1985); *In re Price*, 25 B.R. 256 (Bankr.W.D.Mo.1982)).

■ Bankruptcy courts in the Eighth Circuit must assess undue hardship under the totality of the circumstances test. *Long v. Educ. Cred. Management Corp. (In re Long)*, 322 F.3d 549, 554 (8th Cir.2003)(citing *Andrews v. South Dakota Student Loan Assistance Corp. (In re Andrews)*, 661 F.2d 702, 704 (8th Cir.1981)).

■ In applying this test, courts should consider: (1) the debtor's past, present and reasonably reliable future financial resources; (2) a calculation of the debtor's and debtor's dependent's reasonable necessary living expenses; and (3) any other relevant facts and circumstances surrounding each particular bankruptcy case. *In re Long*, 322 F.3d at 554 (citing *In re Andrews*, 661 F.2d at 704; *Andresen v. Nebraska Student Loan Program, Inc. (In re Andresen)*, 232 B.R. 127, 132 (8th Cir. BAP 1999)).

■ If the debtor's reasonable future financial resources "will sufficiently cover

month. However, a $500.00 a month pay-     ment would defray the debt in 11 years.

payment of the student loan debt-while still allowing for a minimal standard of living-then the debt should not be discharged." *In re Long*, 322 F.3d at 554–55. *See also D'Ettore v. Devry Inst. of Tech. (In re D'Ettore)*, 106 B.R. 715, 718 (Bankr. M.D.Fla.1989) (listing other circumstances to consider in determining whether paying the student loan will result in undue hardship) (citations omitted).

Under the totality of circumstances test, the Court must first examine the Debtor's past, present and future financial resources. The Debtor's schedules reflect that in the past, he and his wife were able to meet living expenses because, except for the four debts that were or are at issue in this adversary proceeding, the Debtor seeks to discharge only one unsecured debt of $2,500.00 to the I.R.S. Unlike many chapter 7 debtors, the Debtor does not list credit card debt, a factor that indicates the Debtor was able to meet daily living expenses. The Debtor testified at trial that he had always paid the Regents and HEAL debts, and the evidence in the record supports that statement. He also made significant payments to Manpower and EOHCC in the past. While paying these debts, he managed to defray a substantial portion of the indebtedness owed for his home and office. While it is true that he became delinquent on the Manpower and EOHCC debts, this fact probably resulted not from insufficient income but rather from failing to maximize his income and minimize his expenses, as will be discussed below.

Based on the 2002 net earnings of the Debtor and his wife of $67,423.00, their monthly net income was $5,618.00 a month. The Debtor testified that his income increased in 2003 in some undetermined sum, but assuming the couple's monthly income remained the same through 2003 until the present, the Court finds that the Debtor and his wife currently net enough income to pay all the Debtor's present monthly expenses listed in Plaintiff's Exhibit 7. These include basic living expenses of $3,086.80, a $100.00 HEAL loan payment, a $335.00 Regent's loan payment, and a proposed $1,000.00 payment every month on the undischarged Manpower debt.[3] Fixed monthly expenses would then total $4,521.80, allowing the couple more than $1,000.00 in disposable income that could be used to increase payments on the nondischargeable debts or for other purposes. Additionally, the Debtor owns savings bonds, an IRA, and cash value in a life insurance policy, all of which are resources that could finance any present financial shortfall the Debtor may experience as a result of his wife's final year of education.

As for the foreseeable future, the Debtor predicts his income will continue to increase. At the same time, his fixed expenses should significantly decrease as he pays off vehicle loans and completes payments on his real property by July 2005. Within ten months, his wife will complete her course requirements and will no longer require money for tuition and books. Remaining tax liabilities for the years 2001 and 2002 may be substantially offset by the $29,000.00 sum that was carried over on the corporate books to 2003. Furthermore, when the Debtor receives his discharge, he will shed his greatest liability, the $120,000.00 EOHCC debt, and that fact alone indicates a brighter financial future for the Debtor.

In short, it appears the Debtor's future financial resources are sufficient to allow a minimal standard of living and pay the

---

3. By the Court's calculation, remitting $1000.00 a month at 12 percent interest will pay the Manpower debt in full in approximately thirteen and one-half years.

Regents debt. Other relevant circumstances support that conclusion. Although the Debtor suffers from high blood pressure and diabetes, he is a relatively young man without serious complications from either condition, and it is not a foregone conclusion that his health will substantially deteriorate during middle age. At present, his health does not impede him from maximizing his income; he simply chooses not to do so. Nothing prevents him from opening his clinic six full days a week to see more patients or from raising his office visit fees. To take either or both steps could mean thousands more in income a month.

In the same vein, the Debtor's wife should make the most of her advanced degree in nursing. Instead, the Debtor and his wife have indicated that she will work in the clinic even after she earns her Master's degree. The Debtor's own testimony revealed that a licensed practical nurse will substitute for his wife at the clinic while she completes course requirements. If a licensed practical nurse can do the job at the clinic, one should be hired full time so that the Debtor's wife can seek more lucrative employment commensurate with her training.

Paring down or eliminating some of the Debtor's nondischargeable debts would take only a few years if income is maximized in these ways. Then the Debtor's wife could join her husband at the clinic for a lesser salary if she so chooses.

The Court also finds that the Debtor has not sufficiently minimized his expenses in that he owns two cars and a motorcycle and makes a total of $764.00 in vehicle payments a month. Two vehicles should be more than sufficient for this couple's transportation needs, especially when the Debtor spends most of his time working next door to his residence. The Court notes that two of the vehicles were purchased after the bankruptcy filing, when the Debtor ceased making student loan payments. The resumption of nondischargeable payments may prompt the Debtor to reevaluate his transportation needs.

### CONCLUSION

The Court finds that the Debtor has sufficient income to pay his minimal living expenses and defray the Regents debt of approximately $42,000.00 without suffering undue hardship. Therefore, the Court determines that the student loan debt owed to Oklahoma State Regents for Higher Education is nondischargeable.

IT IS SO ORDERED.